**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF KENTUCKY**
**PADUCAH DIVISION**
**CIVIL ACTION NO. 5:14-CV-179-TBR**

ANN CHERRY                                                                            Plaintiff

v.

GUY HOWIE, *et al.*                                                                  Defendant

**<u>MEMORANDUM OPINION AND ORDER</u>**

This matter comes before the Court upon Defendants', Guy Howie, Jefferson Alexander, Hopkinsville Police Department and City of Hopkinsville, Kentucky, Motion for Summary Judgment. (Docket No. 34.) The Plaintiff Ann Cherry has responded, (Docket No. 37), and Defendants have replied, (Docket No. 40). Fully briefed, this matter is ripe for adjudication. For the reasons enumerated below, the Court will GRANT in part and DENY in part Defendants' Motion.

Factual Background

Plaintiff Ann Cherry brought this litigation against various defendants, alleging abuse of process, malicious prosecution, and violation of due process. (Docket No. 1 at 6-8.) Ms. Cherry previously served as a Hopkinsville City Councilman. *Id.* at 3. According to Ms. Cherry, the basis for the Defendants' alleged misuse of the legal process against her involves an ordinance proposed by Defendant Guy Howie, the then Chief of Police of Hopkinsville, Kentucky. *Id.* at 3-4. Chief Howie proposed an ordinance to the City that would have required pawn shop owners to use an online service known as "Leads Online," which tracks pawn transactions. *Id.* at 3. Ms.

1

Cherry contends that "[i]f passed, this ordinance would [have] prevent[ed] a pawn shop owner in Hopkinsville . . . from using any competing online service." *Id.* at 4. Ms. Cherry alleges that Leads Online had provided incentives to police departments in exchange for departments getting pawn shops to enter into contractual relationships with Leads Online. *Id.* In July of 2012, Ms. Cherry alleges that after "much objection from local pawn shop owners" she tabled the ordinance against Chief Howie's wishes, pending an Ethics Panel Review. *Id.* The Ethics Hearing was scheduled for August 21, 2012, and Ms. Cherry was to testify there on behalf of the local pawn shop owners. *Id.*

Unrelated, though occurring in a similar time frame, the neighborhood where Ms. Cherry lives became the "target of a suspected prowler." (Docket No. 34-7 at 2.) According to the Defendants, neighbors made reports of "a naked burglar inside one home" and "a masturbating burglar outside another home." (Docket No. 34-7 at 2.) Defendants contend that concerns over the burglar were so high that the burglar became known "as the Southside Prowler." *Id.* Vicci Clodfelter, Ms. Cherry's neighbor, made the report of the masturbating burglar outside of her home. *Id.* When Ms. Clodfelter informed the police of the man outside her home, she reported that "the man she was seeing outside her window was white." *Id.* Defendants allege that shortly after Ms. Clodfelter called authorities, Ms. Cherry met with Ms. Clodfelter "showing her a picture of a black man she thought was the prowler and then showing her surveillance video from another neighbor's house that showed the suspected prowler." *Id.*

In order to alert the community of the suspected prowler, the Hopkinsville Police Department generated an automated phone call warning residents of the suspected prowler. (Docket No. 37 at 4.) The Defendants refer to this as a "Code Red" call. (Docket No. 34-7 at 2.) According to Ms. Cherry, the Code Red call "asked citizens to call the communication center

with any information they might have that would be useful in apprehending the suspect. (Docket No. 37 at 5.) The Defendants allege that Ms. Cherry called 911 in response to the Code Red call and that she "announc[ed] herself as a city councilperson and insist[ed] that the information being disseminated to the public was incorrect because the suspect was black (as allegedly confirmed by her from watching the surveillance video)." Ms. Cherry has provided a transcript of the call in her Response, and the alleged transcript appears to track the Defendants' account of the phone call.[1] (Docket No. 37 at 5.) Defendants further allege that Ms. Cherry had a similar conversation with Chief Howie. (Docket No. 34-7 at 2.)  Defendants also contend that Ms. Cherry sent a "mass email" containing the same allegation, however, they do not cite to the record when discussing this email, and to the Court's knowledge they have not attached this alleged "mass email."[2] (Docket No. 34-7 at 2.) Shortly after sending the first "mass email," the Defendants contend that Ms. Cherry sent another email informing the recipients that perhaps the suspect in the video was white and not black after all. *Id.* at 3. Lastly, Ms. Cherry allegedly sent a copy of her neighbor's surveillance video containing an image of the suspect to a Nashville local news station against the wishes of the law enforcement officers involved in the prowler investigation. *Id.* Ultimately, a white man was convicted for the crimes committed in Ms. Cherry's neighborhood. *Id.*

---

[1] While Ms. Cherry provides an alleged transcript of the 911 call in question in her Response, the Court finds it curious that she did not attach an official or verified transcript as an exhibit that the Court can find. Without such an exhibit, the Court cannot consider the transcript as evidence.

[2] Both parties in this action have failed to adequately cite to the record. The Court "is not required to search the entire record to establish that it is bereft of a genuine issue of material fact." *Emerson v. Novartis Pharm. Corp.*, 446 F. App'x 733, 736 (6th Cir. 2011) (citation omitted) (internal quotation marks omitted). The Sixth Circuit has colorfully explained that "[j]udges are not like pigs, hunting for truffles that might be buried in the record." *Id.* (quoting *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991)). The Court has attempted to review the record to find support for the facts relied upon by the parties, but this task is made more difficult by the parties' sparse citations to the record.

Following these events, Defendants state that Chief Howie asked Defendant Lieutenant Jefferson Alexander of the Hopkinsville Police Department "to look into what had taken place with regard to what he felt was [Ms.] Cherry's hampering of their efforts to investigate the Southside Prowler." *Id.* Lieutenant Alexander gathered information to make a "timeline to review regarding [Ms.] Cherry's activities." (Docket Nos. 34-7 at 3; 37-8 at 1-9.) According to the Defendants, after compiling a timeline, Lieutenant Alexander met with Commonwealth Attorney Lynn Pryor to review the information, and Ms. Pryor then decided to present the issue to a grand jury. (Docket No. 34-7 at 3.)

On August 17, 2012, Ms. Pryor presented testimony from Lieutenant Alexander to a grand jury. (Docket No. 1 at 4.)  According to Ms. Cherry, Officer Alexander testified that she coerced her neighbor Vicci Clodfelter to "change her story" regarding the burglary that took place in Ms. Cherry's neighborhood and to state that the burglary suspect was black, and not white as she initially claimed.  *Id.*  Ms. Cherry also alleges that Lieutenant Alexander testified that she "tampered with public records" by allegedly sending a neighbor's private surveillance video of the alleged burglar to the media. *Id.* at 5.  Lastly, Ms. Cherry contends that Lieutenant Alexander testified that she had "abused her power as a city councilman by interfering in the Hopkinsville Police Department's investigation into the burglary." *Id.* The Grand Jury returned felony indictments for tampering with a witness and tampering with public records, and a misdemeanor indictment for official misconduct.  *Id.* The trial was scheduled for November 19, 2013. *Id.*

With regards to the first charge of tampering with a witness, Ms. Cherry claims that the Defendants did not have any evidence that she committed such a violation. (Docket No. 37 at 2.) Ms. Cherry points to the deposition testimony of her neighbor Ms. Clodfelter for support, as Ms.

Clodfelter testified that Ms. Cherry did not coerce her into changing her description of the race of the suspected prowler. *Id.* at 23. Furthermore, Ms. Clodfelter testified that no one from the Hopkinsville Police Department or the Commonwealth Attorney's Office ever spoke with her about the allegations that Ms. Cherry had coerced her to change her description of the suspected prowler. *Id.* at 23-24. Ms. Cherry contends that Lieutenant Alexander and Chief Howie "concocted a story" that she had coerced Ms. Clodfelter to alter her statement as to the suspected prowler's race. *Id.* at 2.

Concerning the charge of tampering with public records, Ms. Cherry argues that the surveillance tape that she gave to the Nashville news station was privately owned and voluntarily released to her by the owners and, therefore, was not a "public record." *Id.* at 3-4. Additionally, with regards to the call Ms. Cherry made to 911 calling into question the accuracy of the Code Red call, she argues that it also cannot be the basis for a charge of tampering with public records because she did not change or destroy the Code Red call in any way. *Id.* Ms. Cherry argues that her actions do not make her subject to criminal liability under the statute. *Id.* at 3-4; *see also* Ky. Rev. Stat. § 519.060.

Lastly, regarding the charge of Official Misconduct, Ms. Cherry claims that it too was in error and based on faulty information as her previous two charges were used as support for this charge, and she believes the previous two charges do not have a sound basis. (Docket No. 37 at 5.)

Following her indictment and the service of a criminal summons, Ms. Cherry entered into plea negotiations with Commonwealth Attorney Lynn Pryor. (Docket No. 1 at 5-6.) The first plea offer was made in October 2012, "shortly before the November 2012 election, in which Ms. Cherry was the incumbent candidate for city council." *Id.* at 5. According to Ms. Cherry, Ms.

Pryor offered to dismiss all charges if Cherry would "drop out of the election before November 2012 and not run for Mayor or City Council again." *Id.* Ms. Cherry contends that she instructed her defense attorney to respond to the offer and to tell Ms. Pryor that she would consider the offer if Ms. Pryor would put it in writing. *Id.* Ms. Cherry states that Ms. Pryor then responded with a second offer that she would put the offer in writing if Ms. Cherry would additionally plead guilty to the misdemeanor. *Id.* at 6.  On the morning of trial, Ms. Pryor made three additional offers to Ms. Cherry. *Id.* In the third offer, which Ms. Cherry accepted, Ms. Pryor agreed to dismiss with prejudice all charges if Ms. Cherry would agree "to drop off the City Council in January 2014, plus agree not [to] run for Mayor, and not [to] run for the City Council position again." *Id.; see also* Docket No. 37-4 at 1.

Ms. Cherry contends that the criminal investigation and indictment detailed above occurred because she opposed Chief Howie's proposed ordinance, and he harbored ill will toward her. To support her connection, Ms. Cherry provides two affidavits from two former members of the Hopkinsville Police Department. (Docket Nos. 37-2; 37-3.) In the first affidavit, Mr. Terry Parker recounts an instance where Chief Howie allegedly stated that "Ann Cherry is part of the Guy Howie haters club and he was coming at her with both barrels." (Docket No. 37-2 at 1.) In the second affidavit, Mr. Chuck Inman states that Chief Howie referred to Ms. Cherry as "dumb ass blond bitch" and stated that "she don't know her ass from a hole in the ground." (Docket No. 37-3 at 1.) Mr. Inman's affidavit also reveals that Chief Howie allegedly asked him to look into Ms. Cherry's campaign finances, and he suspects that Chief Howie may have been conducting an independent investigation into her campaign finances. *Id.* Ms. Cherry presents these instances as proof of Chief Howie's animus and the underlying reasoning for the

Hopkinsville Police Department's investigation into her involvement with the investigation of the suspected prowler and ultimately her indictment and prosecution.

### Legal Standard

Summary judgment is appropriate when the record, viewed in the light most favorable to the nonmoving party, reveals "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists where "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The Court "may not make credibility determinations nor weigh the evidence when determining whether an issue of fact remains for trial." *Laster v. City of Kalamazoo*, 746 F.3d 714, 726 (6th Cir. 2014) (citing *Logan v. Denny's, Inc.*, 259 F.3d 558, 566 (6th Cir. 2001); *Ahlers v. Schebil*, 188 F.3d 365, 369 (6th Cir. 1999)). "The ultimate question is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Back v. Nestlé USA, Inc.*, 694 F.3d 571, 575 (6th Cir. 2012) (quoting *Anderson*, 477 U.S. at 251–52).

As the parties moving for summary judgment, Defendants must shoulder the burden of showing the absence of a genuine dispute of material fact as to at least one essential element of Ms. Cherry's claims. Fed. R. Civ. P. 56(c); *see Laster*, 746 F.3d at 726 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)). Assuming Defendants satisfy their burden of production, Ms. Cherry "must—by deposition, answers to interrogatories, affidavits, and admissions on file— show specific facts that reveal a genuine issue for trial." *Laster*, 746 F.3d at 726 (citing *Celotex Corp.*, 477 U.S. at 324). Keeping this standard in mind, the Court moves on to the merits.

Discussion

I.      Ms. Cherry's Malicious Prosecution Claims

In her complaint, Ms. Cherry asserts a state law claim for malicious prosecution. (Docket

No. 1 at 7.) According to the Kentucky Supreme Court, "[t]he law generally disfavors the tort of

malicious prosecution because all persons [should] be able to freely resort to the courts for

redress of a wrong[.]" *Garcia v. Whitaker*, 400 S.W.3d 270, 274 (Ky. 2013) (alterations in

original) (quoting *Raine v. Drasin*, 621 S.W.2d 895, 899 (Ky. 1981)) (internal quotation marks

omitted). Because the law disfavors malicious prosecution, "claimants alleging malicious

prosecution must strictly comply with each element of the tort." *Id.* (citing *Raine*, 621 S.W.2d at

899). To prevail on a claim for malicious prosecution in Kentucky, a plaintiff must prove the

following elements:

> 1) the institution or continuation of original judicial proceedings, either
> civil or criminal, or of administrative or disciplinary proceedings, (2) by,
> or at the instance, of the plaintiff, (3) the termination of such proceedings
> in defendant's favor, (4) malice in the institution of such proceeding, (5)
> want or lack of probable cause for the proceeding, and (6) the suffering
> of damage as a result of the proceeding

*Id.* (quoting *Raine*, 621 S.W.2d at 899.)

Here, the Defendants focus on the question of immunity rather than whether or not Ms.

Cherry has provided sufficient evidence to survive a motion for summary judgment on the merits

of her malicious prosecution claim. (Docket No. 34-7 at 29-33.) However, given that under

current case law, Ms. Cherry's claim for malicious prosecution cannot succeed as a matter of

law, the Court will address the merits of her malicious prosecution claim instead of the issue of

immunity. Ms. Cherry cannot satisfy the third element of a claim for malicious prosecution in

Kentucky, which requires the termination of the proceeding at issue in the defendant's favor, and therefore, her claim for malicious prosecution must fail. *Garcia v. Whitaker*, 400 S.W.3d at 274.

In a recent unpublished opinion, the Sixth Circuit Court of Appeals discussed Kentucky courts' analysis of the third element of a malicious prosecution claim.  The court noted that "[t]he determination of whether a termination is sufficiently favorable ultimately rests with the trial court as a matter of law, absent a factual dispute relative to the circumstances of the dismissal." *Ohnemus v. Thompson*, 594 F. App'x 864, 866 (6th Cir. 2014) (2015) (quoting *Davidson v. Castner–Knott Dry Goods Co., Inc.*, 202 S.W.3d 597, 606 (Ky. Ct. App. 2006)). The Kentucky Court of Appeals has looked to § 660 of the Restatement (Second) of Torts for guidance on when a proceeding has terminated in the accused's favor. *Alcorn v. Gordon*, 762 S.W.2d 809, 811 (Ky. Ct. App. 1988). According to the portion of the Restatement relied upon by the court, "[p]roceedings are 'terminated in favor of the accused' . . . only when their final disposition is such as to indicate the innocence of the accused." *Id.* (citing Restatement (Second) of Torts § 660).  In other words, the termination of the proceedings at issue "must go to the merits of the accused's professed innocence for [it] to be 'favorable' to [her]." *Ohnemus*, 594 F. App'x at 867 (citations omitted) (collecting case law for support). Furthermore, "[i]n order for a termination of proceedings to be favorable to the accused, the dismissal must be one-sided and *not the result of any settlement or compromise*." *Id.* (emphasis added) (citations omitted). If the dismissal is "not the unilateral act of the prosecutor" and the accused "[gives] up something to secure dismissal of the charges," the termination of the proceedings is not favorable to the accused.  *Broaddus v. Campbell*, 911 S.W.2d 281, 284 (Ky. Ct. App. 1995). In Kentucky, "it is settled that a dismissal by compromise of the accused is not a termination favorable to the accused." *Id.* The Sixth Circuit and the Kentucky Court of Appeals have both looked to the

Restatement § 660 and its discussion of the effect of a settlement or compromise on a malicious prosecution claim. *Ohnemus*, 594 F. App'x at 867; *Broaddus*, 911 S.W.2d at 284. Both courts cited the following passage from the Restatement (Second) of Torts § 660(a) (1977):

> A termination of criminal proceedings in favor of the accused other than by acquittal is not a sufficient termination to meet the requirements of a cause of action for malicious prosecution if
>
> (a) the charge is withdrawn or the prosecution abandoned pursuant to an agreement of compromise with the accused.

*Ohnemus*, 594 F. App'x at 867; *Broaddus*, 911 S.W.2d at 284. They also went on to note the rationale for the rule as explained in § 660(c):

> Although the accused by his acceptance of a compromise does not admit his guilt, the fact of compromise indicates that the question of his guilt or innocence is left open. *Having bought peace the accused may not thereafter assert that the proceedings have terminated in his favor.*

*Ohnemus*, 594 F. App'x at 867; *Broaddus*, 911 S.W.2d at 284 (emphasis added).

Here, according to Ms. Cherry's Complaint, she received several plea offers from Ms. Pryor. (Docket No. 1 at 5-6.) Ms. Cherry refused numerous offers before accepting an offer on the morning that her trial was scheduled to begin. *Id.* at 6. Ms. Cherry recounts that in the final offer Ms. Pryor agreed to "dismiss with prejudice, all charges . . ., if [Ms.] Cherry would agree to drop off the City Council in January 2014, plus agree not [to] run for Mayor, and not [to] run for the City Council position again." *Id.* Ms. Cherry accepted this final offer. *Id.* As Ms. Cherry undeniably "gave up something to secure dismissal of the charges" against her and compromised with the Commonwealth Attorney's Office, she cannot satisfy the third element of a malicious prosecution claim requiring that the proceedings at issue terminate in the accused's favor.

*Broaddus*, 911 S.W.2d at 284. Ms. Cherry's state law malicious prosecution claim fails as a matter of law.

## II.     Ms. Cherry's Abuse of Process Claim

Ms. Cherry also pursues a state law claim for abuse of process. "Generally stated, one who uses a legal process, whether criminal or civil, against another primarily to accomplish a purpose for which that process is not designed, is subject to liability to the other for harm caused by the abuse of process." *Sprint Commc'ns Co., L.P. v. Leggett*, 307 S.W.3d 109, 113 (Ky. 2010). "The improper purpose usually takes the form of coercion to obtain a collateral advantage, not properly involved in the proceeding itself, such as the surrender of property or the payment of money, by the use of the process as a threat or a club." *Flynn v. Songer*, 399 S.W.2d 491, 494 (Ky. 1966); *see also Bonnie Braes Farms, Inc. v. Robinson*, 598 S.W.2d 765, 765 (Ky. Ct. App. 1980). "There is, in other words, a form of extortion, and it is what is done in the course of negotiation, rather than the issuance or any formal use of the process itself, which constitutes the tort." *Simpson v. Laytart*, 962 S.W.2d 392, 395 (Ky. 1998) (quoting W. Prosser, *Handbook of the Law of Torts*, § 121 (4th ed. 1971)). This tort differs from malicious prosecution in that "malicious prosecution consists in maliciously causing process to be issued, whereas an abuse of process is the employment of legal process for some other purpose other than that which it was intended by the law to effect." *Raine*, 621 S.W.2d at 902. In an abuse of process claim, "[t]he purpose for which the process is used, once it is issued, is the only thing of importance." *Flynn*, 399 S.W.2d at 494.

The essential elements of a claim for abuse of process are "(1) an ulterior purpose and (2) a willful act in the use of the process not proper in the regular conduct of the proceeding." *Bonnie Braes Farms,* 598 S.W.2d at 765 (citing W. Prosser, *Handbook of the Law of Torts*, §

121 (4th ed. 1978)). Both elements must be present, as "there is no liability where the defendant has done nothing more than carry out the process to its authorized conclusion even though with bad intentions." *Simpson*, 962 S.W.2d at 395.

Two cases illustrate the difference between the proper use of process, though ill-motivated, and an abuse of process. In *Mullins v. Richards* a dispute arose over the quality of car repair work done by Norman Mullins. 705 S.W.2d 951 (Ky. Ct. App. 1986). Two of Mullins' customers were dissatisfied and "appeared before a Boyle County Grand Jury seeking indictments against [Mullins] for theft by deception of over $100.00." *Id.* at 952. Mullins was charged. However, the criminal court declared a mistrial after hearing testimony from the first witness. *Id.* Mullins subsequently brought a civil action against his former customers for abuse of process. The trial court granted a directed verdict against Mullins. The Kentucky Court of Appeals affirmed, holding:

> Although appellees may have had an ulterior purpose in securing the indictments against appellant, the record contains no evidence that appellees attempted to use the indictments against appellant outside the criminal proceeding. In fact, appellant testified that he had no contact with appellees between the date of the indictment and the date of trial. If appellees had offered to drop the indictments in return for a release of their debts to appellant, then appellant would have stated a cause of action on his claim for abuse of process.

*Id.*

Alternatively, in *Flynn v. Songer*, a dispute arose over an unpaid balance on tires. 399 S.W.2d at 492. The Plaintiff Mr. Flynn was the credit manager of the tire corporation where the Defendant Mr. Songer had purchased tires years earlier. *Id.* When Mr. Flynn attempted to collect the remaining balance, Mr. Songer told him to contact his previous employer for whom he purchased the tires on credit and referred the matter to his attorney and fellow Defendant Mr. Van Horn. *Id.* Mr. Flynn informed Mr. Van Horn that if the balance on the account was not paid,

he would have no choice but to garnish Mr. Songer's wages for the remaining amount. *Id.* As the balance remained unpaid, Mr. Flynn initiated garnishment proceedings against Mr. Songer. *Id.* In retaliation, Mr. Songer reported to authorities that Mr. Flynn was illegally practicing law without a license as Mr. Flynn was representing the tire corporation in the garnishment action, and he was not an attorney. *Id.* A magistrate judge issued an arrest warrant for Mr. Flynn based upon an affidavit submitted by Mr. Songer. *Id.* Upon the magistrate judge's issuance of the arrest warrant, Mr. Songer and Mr. Van Horn contacted Mr. Flynn. *Id.* Both of the Defendants denied that they had attempted to use the dismissal of the warrant to coerce Mr. Flynn to dismiss the garnishment proceedings in their respective contact with him following the issuance of the arrest warrant. *Id.* at 493. However, Mr. Songer did admit that he procured the arrest warrant in part to fight the garnishment proceedings instituted by Mr. Flynn. *Id.* The arrest warrant against Mr. Flynn was eventually dismissed, as Mr. Songer was unable to appear on the days the Court attempted to schedule the trial. *Id.*

Following the court's dismissal of the arrest warrant, Mr. Flynn brought a civil action for abuse of process and malicious prosecution against Mr. Songer and Mr. Van Horn. *Id.* The action proceeded to trial where the jury found in favor of the defendants, and subsequently, Mr. Flynn appealed the decision of the lower court. Kentucky's highest court stated that upon a re-trial it believed Mr. Flynn "was entitled to a directed verdict on the issue of abuse of process." *Id.* The court reasoned as follows:

> It is true that both Songer and Van Horn denied any intent or attempt at coercion upon Flynn, but at the same time each of them admitted having communicated with him, on the day the warrant for his arrest was issued, in an effort to obtain a release or settlement of the attachment Flynn had caused to be levied on Songer's wages. Considering these actions in the light of Van Horn's own testimony that when Songer had asked him what he could do about the attachment he advised Songer 'he could fight the attachment in court, have a hearing, or he could get a warrant for Gene

> Flynn for practicing law without a license,' and Songer's admission that his purpose in procuring the warrant included 'fighting the garnishment,' it would transcend the uttermost bounds of reasonable credulity to believe that Songer and Van Horn did not expect and intend the pressure of the criminal process to perform a catalytic agency in persuading Flynn to release the attachment. It makes no difference whether they did or did not intend to withdraw the criminal charge, provisionally or otherwise. The gist of the tort is that they attempted to use it as a means to secure a collateral advantage.

*Id.* at 494-95. Given both Mr. Songer and Mr. Van Horn's acknowledgement that the prosecution could be and was used to fight the garnishment proceedings and their out-of-court contact with Mr. Flynn, the court concluded that if similar evidence was presented at the re-trial, Mr. Flynn would be entitled to a directed verdict. *Id.* at 495. The Defendants Mr. Songer and Mr. Van Horn used the criminal proceedings against Mr. Flynn as a "threat or a club" to coerce him to forego the garnishment action.

Here, while the parties have not cited to any evidence in the record that the Defendants had contact with Ms. Cherry outside the criminal proceedings where they used the criminal proceeding as a "threat or a club," the Court believes Ms. Pryor's plea offers to and ultimate agreement with Ms. Cherry are highly unusual. The Court is at somewhat of a disadvantage without a transcript of Lieutenant Alexander's grand jury testimony or any testimony from Ms. Pryor. However, even without such evidence in the record, the Court believes that there is sufficient circumstantial evidence for Ms. Cherry's claim of abuse of process to survive a Motion for Summary Judgment. A jury could reasonably infer that Ms. Pryor received input from or was influenced by the Defendants when she utilized the judicial process to prevent Ms. Cherry from holding public office in the City of Hopkinsville. Indeed, Chief Howie admits in his deposition that he spoke with Ms. Pryor via telephone in the months leading up to the trial. (Docket No. 34-3 at 13.) After much consideration, the Court finds that Ms. Cherry's claim for

14

abuse of process survives Defendants' Motion for Summary Judgment because there is a genuine dispute of material fact.

As Ms. Cherry's abuse of process claim survives substantively, the Court must address the question of absolute immunity. Defendants argue that because Ms. Cherry's claim is based largely upon Lieutenant Alexander's grand jury testimony and her subsequent indictment, her claim cannot survive because Lieutenant Alexander enjoys absolute immunity under the judicial statement privilege. (Docket No. 34-7 at 4; 33-35.) However, the Kentucky Court of Appeals has recently established in a published opinion that "the judicial statement privilege has no application to abuse of process claims." *Halle v. Banner Indus. of N.E., Inc.*, 453 S.W.3d 179, 187 (Ky. Ct. App. 2014). The court reasoned that "when allegations of misconduct properly put an individual's intent at issue in a civil action, statements made in judicial proceedings may be used for evidentiary purposes in determining whether an individual acted with the requisite intent." *Id.* (quoting *Baglini v. Lauletta*, 717 A.2d 449 (N.J. Super. Ct. Law Div. 1998)). Importantly, the Kentucky Court of Appeals re-affirmed its ruling in *Halle* with regards to the judicial statement privilege's inapplicability in abuse of process claims earlier this month in *DeMoisey v. Ostermiller*, – S.W.3d –, 2016 WL 2609321, at *13 (Ky. Ct. App. May 6, 2016). Though the Defendants urge this Court to follow case law prior to and contrary to *Halle*, (Docket No. 34-7 at 33-34), the Court must apply controlling Kentucky law and, therefore, the Court finds that Lieutenant Alexander is not shielded by absolute immunity as the judicial statement privilege does not apply to abuse of process claims in Kentucky.

III.    Ms. Cherry's § 1983 Claims

Again, as with the previous two claims, the Defendants generally focus on the question of immunity rather than whether or not Ms. Cherry has provided sufficient evidence to survive a motion for summary judgment on the merits of her claims under § 1983. However, given that under current case law, Ms. Cherry's claims under § 1983 cannot succeed as a matter of law, the Court will address the merits of her claims instead of the issue of immunity.

Congress enacted 42 U.S.C. § 1983 to "protect[] citizens from violations of their federal rights by state officials." *Bradley v. Reno*, 749 F.3d 553, 558 (6th Cir. 2014). "Section 1983 is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred." *Modrell v. Hayden*, 636 F. Supp. 2d 545, 552 (W.D. Ky. 2009), *aff'd*, 436 F. App'x 568 (6th Cir. 2011) (quoting *Albright v. Oliver*, 510 U.S. 266, 272 (1994)). To successfully bring a claim under § 1983, a plaintiff must show "the violation of a right secured by the Constitution and laws of the United States, and . . . show that the alleged deprivation was committed by a person acting under color of state law." *Id.* (quoting *West v. Atkins*, 487 U.S. 42, 48 (1988)).

In this action, there is no dispute that the Defendants were acting under color of state law. (*See* Docket Nos. 34-7; 37; 40.) The question before this Court is whether or not the Defendants violated "a right secured by the Constitution and laws of the United States."  In this action, Ms. Cherry's Complaint makes a general allegation that "each of the defendants conspired with one or more of the other defendants to violate [her] rights to due process and to be free from unreasonable searches and seizures as guaranteed by the 4th, 5th, and 14th amendments of the Constitution and the laws of the United States, when they conspired to charge and prosecute

16

[her] in violation of 42 U.S.C. § 1983." First, with regards to any claim concerning the Fourth Amendment, Ms. Cherry does not address such a claim in her Response to Defendants' Motion for Summary Judgement. (*See* Docket No. 37.) However, the Court will look to the merits of any possible claim that Ms. Cherry may have for the Defendants' alleged violation of her rights under the Fourth Amendment below. Concerning Ms. Cherry's invocation of the Fifth Amendment, as this action involves state not federal actors, she cannot successfully assert a claim under the Fifth Amendment. *Scott v. Clay Cty., Tenn.*, 205 F.3d 867, 873 n.8 (6th Cir. 2000) (citations omitted) ("The Fourteenth Amendment's Due Process Clause restricts the activities of the states and their instrumentalities; whereas the Fifth Amendment's Due Process Clause circumscribes only the actions of the federal government. *Ergo*, the instant complainant's citation to the Fifth Amendment Due Process Clause [is] a nullity, and redundant of her invocation of the Fourteenth Amendment Due Process Clause.")   Lastly, in regards to Ms. Cherry's due process claim(s) under the Fourteenth Amendment, it is unclear from her Complaint whether or not she seeks to bring either a substantive or procedural due process claim or both. (Docket No. 1 at 8.)   However, in her Response to Defendants' Motion for Summary Judgment, Ms. Cherry only addresses a claim for the alleged violation of her substantive due process rights. (Docket No. 37 at 22-26.) Therefore, the Court will address whether or not Ms. Cherry's substantive due process claim survives Defendants' Motion for Summary Judgment.[3]

---

[3] Ms. Cherry has not addressed nor has she pointed to any evidence in the record that would support a claim under § 1983 for a violation of her Fourteenth Amendment procedural due process rights. The Fourteenth Amendment provides that no State "shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV. § 1. "The Fourteenth Amendment's guarantee of procedural due process assures that the deprivation of life, liberty, or property will not be effectuated without notice and opportunity for hearing appropriate to the nature of the case." *Barachkov v. 41B Dist. Court*, 311 F. App'x 863, 871 (6th Cir. 2009) (quoting *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985)) (internal quotation omitted). The Sixth Circuit Court of Appeals requires that "to establish a procedural due process violation in the context of an illegal arrest, detention, or prosecution, a plaintiff must prove one of two things." *Fisher v. City of Detroit*, 4 F.3d 993, 1993 WL 344261, at * 3 (6th Cir. 1993) (unpublished table decision). First, the plaintiff may prove that the Defendants "had an established procedure of prosecuting groundless criminal actions" against city council members to force them to resign their

Substantive due process reflects the principle that "governmental deprivations of life, liberty or property are subject to limitations regardless of the adequacy of the procedures employed." *Cross v. Metro. Gov't of Nashville/Davidson Cty.*, No. 3-12-1109, 2013 WL 1899169, at *4 (M.D. Tenn. May 7, 2013) (citing *Pearson v. City of Grand Blanc*, 961 F.2d 1211, 1216 (6th Cir. 1992)). "Substantive due process claims may be loosely divided into two categories: (1) deprivations of a particular constitutional guarantee; and (2) actions that 'shock the conscience.'" *Valot v. Se. Local Sch. Dist. Bd. of Educ.*, 107 F.3d 1220, 1228 (6th Cir. 1997) (first citing *Pusey v. City of Youngstown*, 11 F.3d 652, 656 (6th Cir. 1993); then citing *Mansfield Apartment Owners Ass'n v. City of Mansfield*, 988 F.2d 1469, 1474 (6th Cir. 1993)). Notably, as pointed out by another Sixth Circuit district court, "a citizen . . . does not suffer a constitutional deprivation every time he or she is subjected to some form of harassment by a government agent." *O'Connor v. Kelty*, No. 4:10 CV 338, 2013 WL 322199, at *7 (N.D. Ohio Jan. 24, 2013), *aff'd* (Oct. 22, 2013) (citing *Salerno*, 481 U.S. at 833). "Rather, the conduct must be so severe, so disproportionate to the need presented, and such an abuse of authority as to transcend the bounds of ordinary tort law and establish a deprivation of constitutional rights." *Id.* (citing *Salerno*, 481 U.S. at 833).

Importantly, the United States Supreme Court has expressed its reluctance "to expand the concept of substantive due process because the guideposts for responsible decisionmaking in this

---

office. *Bacon v. Patera*, 772 F.2d 259, 264 (6th Cir. 1985) (citations omitted). Second, in the alterative, the plaintiff "may show that the particular defendants' conduct was 'random and unauthorized,' and fell short of due process." *Fisher*, 1993 WL 344261 at *3 (citing *Bacon*, 772 F.2d at 264). "In order to prevail on this second method, the plaintiff must also show that state remedies prohibiting the unauthorized conduct provide insufficient redress." *Id.* (citing *Wilson v. Beebe*, 770 F.2d 578, 583-84 (6th Cir.1985)). Ms. Cherry makes no claim and does not cite to any evidence in the record that the Defendants have a policy or procedure of prosecuting groundless claims against city council members. Furthermore, she does not argue that the Defendants' actions are "random and unauthorized." Even if she had done so, she has not made any attempt to show that the state remedy of abuse of process provides insufficient redress.

unchartered area are scarce and open-ended." *Albright v. Oliver*, 510 U.S. 266, 271-72 (1994). Consequently, the Court has established that "[w]here a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims." *Id.* at 273 (quoting *Graham v. Connor*, 490 U.S. 386, 395 (1989)) (internal quotation marks omitted).

Here, Ms. Cherry alleges that the Defendants conspired to engage in a wrongful investigation and prosecution. (Docket No. 37 at 22-26.) "The due process requirements for criminal proceedings do not include a standard for the initiation of a criminal prosecution." *Albright*, 510 U.S. at 283 (Kennedy, J. and Thomas, J., concurring)). Therefore, it is the Fourth Amendment and its protections against malicious prosecution rather than the "more generalized notion of substantive due process" that provides Ms. Cherry with a source of constitutional protection. The Sixth Circuit "recognize[s] a separate constitutionally cognizable claim of malicious prosecution under the Fourth Amendment." *Barnes v. Wright*, 449 F.3d 709, 715-16 (6th Cir. 2006) (quoting *Thacker v. City of Columbus*, 328 F.3d 244, 259 (6th Cir. 2003)). "Such a claim encompasses wrongful investigation, prosecution, conviction, and incarceration." *Id.* (citing *Thacker*, 328 F.3d at 258). The Sixth Circuit has established the elements necessary to succeed on a Fourth Amendment malicious prosecution under § 1983. The court stated the following:

> To succeed on a malicious-prosecution claim under § 1983 when the claim is premised on a violation of the Fourth Amendment, a plaintiff must prove the following: First, the plaintiff must show that a criminal prosecution was initiated against the plaintiff and that the defendant "ma[d]e, influence[d], or participate[d] in the decision to prosecute."[5] *Fox v. DeSoto,* 489 F.3d 227, 237 (6th Cir.2007); *see also McKinley v. City of Mansfield,* 404 F.3d 418, 444 (6th Cir.2005); *Darrah v. City of Oak Park,* 255 F.3d 301, 312 (6th Cir.2001); *Skousen v. Brighton High*

*Sch.,* 305 F.3d 520, 529 (6th Cir.2002). Second, because a § 1983 claim is premised on the violation of a constitutional right, the plaintiff must show that there was a lack of probable cause for the criminal prosecution, *Fox,* 489 F.3d at 237; *Voyticky,* 412 F.3d at 675. Third, the plaintiff must show that, "as a consequence of a legal proceeding," the plaintiff suffered a "deprivation of liberty," as understood in our Fourth Amendment jurisprudence, apart from the initial seizure. *Johnson v. Knorr,* 477 F.3d 75, 81 (3d Cir.2007); *see Gregory v. City of Louisville,* 444 F.3d 725, 748–50 (6th Cir.2006) (discussing the scope of "Fourth Amendment protections ... beyond an initial seizure," including "continued detention without probable cause"); *cf. Heck v. Humphrey,* 512 U.S. 477, 484, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994) ("[U]nlike the related cause of action for false arrest or imprisonment, [an action for malicious prosecution] permits damages for confinement imposed pursuant to legal process."). Fourth, the criminal proceeding must have been resolved in the plaintiff's favor. *Heck,* 512 U.S. at 484, 114 S.Ct. 2364 ("One element that must be alleged and proved in a malicious prosecution action is termination of the prior criminal proceeding in favor of the accused.").

*Sykes v. Anderson*, 625 F.3d 294, 308-09 (6th Cir. 2010). As with her state law claim for malicious prosecution, Ms. Cherry cannot satisfy the element requiring that the criminal proceeding at issue terminated in her favor. *See Ohnemus*, 594 F. App'x at 867; *see also supra* Part I. For the reasons articulated earlier in this opinion, Ms. Cherry's claim for malicious prosecution under § 1983 does not satisfy the final element established by the Sixth Circuit and, therefore, fails as a matter of law.

Conclusion and Order

For the aforementioned reasons, Defendants' Motion for Summary Judgment is GRANTED in part and DENIED in part.

A **telephonic status conference and/or scheduling conference** is set for **June 10, 2016 at 11:00 AM Central Time**. The Court will place the call to counsel.

cc: Counsel