UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
PADUCAH DIVISION
CIVIL ACTION NO. 5:14-CV-00179-TBR

ANN CHERRY                                                                              PLAINTIFF

v.

GUY HOWIE, *et al.*                                                                 DEFENDANTS

**Memorandum Opinion and Order**

This matter is before the Court upon Defendants' renewed motion for summary judgment on Plaintiff Ann Cherry's sole remaining claim, abuse of process. [DN 69.][1] Cherry responded, [DN 71], and Defendants replied, [DN 72.] Fully briefed, Defendants' motion is ripe for adjudication. For the following reasons, that motion [DN 69] is DENIED.

**I. Facts and Procedural History**

On two prior occasions, this Court has addressed the merits of Ann Cherry's claims against Defendants. *See* [DN 21; DN 42.] As such, the Court need only provide a brief recitation of the facts, paying particular attention to the discovery conducted by the parties since the last time the Court visited this case. *See Cherry v. Howie*, 191 F. Supp. 3d 707 (W.D. Ky. 2016).

Ann Cherry previously served as a Hopkinsville, Kentucky City Councilman. In 2012, Defendant Guy Howie, then serving as Hopkinsville's Chief of Police, proposed an ordinance that would require local pawn shops to use an online service

---

[1] Defendants filed a supporting memorandum alongside their instant motion. The Court notes, however, that pursuant to Joint General Order 2017-01, Local Rule 7.1 no longer requires motions and memoranda to be filed separately.

known as "Leads Online," which tracks pawn transactions. Based upon objections from pawn shop owners and her belief that Leads Online provided improper incentives to police departments, Cherry opposed the ordinance and scheduled it for an ethics hearing.

Around the same time, a man later dubbed the "Southside Prowler" began burglarizing homes in Cherry's neighborhood. Several persons, including Vicci Clodfelter, Cherry's neighbor, reported to police that they saw a white man masturbating in view of their homes. Responding to these reports, the Hopkinsville Police Department generated an automated "Code Red" phone call warning residents of the Southside Prowler and describing his appearance. Defendants allege that Cherry then attempted to convince both the authorities and her neighbors that the burglar was black, not white, based upon a surveillance video she was shown by another neighbor. Ultimately, a white man was convicted for the crimes committed in Cherry's neighborhood.

Following these events, Chief Howie asked Defendant Jefferson Alexander, a police lieutenant, to investigate Cherry's alleged interference with the Hopkinsville Police Department's pursuit of the Southside Prowler. After compiling a timeline, Defendants state that Alexander met with Commonwealth Attorney Lynn Pryor to review the information. In her recent deposition, Pryor testified that neither Howie nor Alexander mentioned the pawn shop ordinance during these conversations. [DN 69-2 at 3-4.] Pryor and Alexander did, however, discuss

2

whether a potential criminal indictment would impact Cherry's status as a sitting member of the City Council. [*Id.* at 4.]

Based upon those discussions, Pryor decided to present Cherry's case to a grand jury. There, Alexander testified that following the Code Red call, Cherry called 911, seeking to convince the police department of her own belief that the Southside Prowler was a black man. [DN 71 at 7-12.] He also told the grand jury that Cherry had emailed this erroneous information to her constituents, and had released a surveillance video to a Nashville news station against the wishes of Chief Howie. [*Id.* at 17-24.] Based upon Alexander's testimony, the grand jury returned felony indictments for tampering with a witness and tampering with public records, and a misdemeanor indictment for official misconduct. Cherry maintains that none of those charges had a sound basis.

Following her indictment, Cherry entered into extended plea negotiations with the Commonwealth. According to Cherry, all the proposed offers required her to resign her seat as a councilmember and agree not to run for mayor. On the morning of Cherry's trial, the parties reached a settlement. In exchange for the Commonwealth's dismissal of her criminal charges, Cherry resigned her position and promised not to run for mayor or city council in the future. Pryor does not recall who first proposed this settlement, nor does she recall Howie or Alexander expressing a desire to have Cherry removed from city council. [DN 69-2 at 5-6.]

Cherry then filed the instant suit. *See* [DN 1.] The crux of her allegations is that Defendants pursued unfounded criminal charges against her in retaliation

3

for her opposition to the proposed pawn shop ordinance, with the ultimate goal of removing her from elected office. Cherry's complaint included claims for abuse of process, malicious prosecution, and violation of her constitutional due process rights. She named as defendants Chief Howie, Lieutenant Alexander, Commonwealth Attorney Pryor, the Hopkinsville Police Department, and the City of Hopkinsville.

The Court dismissed Cherry's claims against Commonwealth Attorney Lynn Pryor, holding that Pryor was entitled to absolute immunity. *See* [DN 21.] Then, upon motion by the remaining Defendants, the Court granted summary judgment on Cherry's malicious prosecution and § 1983 claims.[2] *Cherry*, 191 F. Supp. 3d at 715, 721. Because Cherry had to give something up in exchange for dismissal of her charges, the criminal proceeding against her did not terminate in her favor – an element necessary to establish liability on both claims. *Id.* However, the Court denied Defendants' motion as to Cherry's abuse of process claim, writing that "Ms. Pryor's plea offers to and ultimate agreement with Ms. Cherry are highly unusual. . . . A jury could reasonably infer that Ms. Pryor received input from or was influenced by the Defendants when she utilized the judicial process to prevent Ms. Cherry from holding public office in the City of Hopkinsville." *Id.* at 717-18. The Court allowed the parties to conduct further discovery on this claim, and they did. After deposing Pryor and obtaining Alexander's grand jury testimony, Defendants

---

[2] Although the Court dismissed Cherry's federal claim under § 1983, the Court retains supplemental jurisdiction over Cherry's remaining state law abuse of process claim due to the considerable effort the parties have already expended in this litigation, the advanced stage of the case, and relative simplicity of Cherry's claim. *See* 28 U.S.C. § 1367(c); *Wilson v. Trege*, 787 F.3d 322, 326 (5th Cir. 2015).

4

renewed their motion for summary judgment. [DN 69.] Cherry responded, [DN 71], and Defendants replied, [DN 72].

## II. Standard of Review

Summary judgment is appropriate when the record, viewed in the light most favorable to the nonmoving party, reveals "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists where "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The Court "may not make credibility determinations nor weigh the evidence when determining whether an issue of fact remains for trial." *Laster v. City of Kalamazoo*, 746 F.3d 714, 726 (6th Cir. 2014) (citing *Logan v. Denny's, Inc.*, 259 F.3d 558, 566 (6th Cir. 2001); *Ahlers v. Schebil*, 188 F.3d 365, 369 (6th Cir. 1999)). "The ultimate question is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Back v. Nestlé USA, Inc.*, 694 F.3d 571, 575 (6th Cir. 2012) (quoting *Anderson*, 477 U.S. at 251–52).

As the parties moving for summary judgment, Defendants must shoulder the burden of showing the absence of a genuine dispute of material fact as to at least one essential element of Cherry's abuse of process claim. Fed. R. Civ. P. 56(c); see *Laster*, 746 F.3d at 726 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)). Assuming Defendants satisfy their burden of production, Cherry "must—by

deposition, answers to interrogatories, affidavits, and admissions on file—show specific facts that reveal a genuine issue for trial." *Laster*, 746 F.3d at 726 (citing *Celotex Corp.*, 477 U.S. at 324).

### III. Discussion

To ultimately prevail against Defendants, Cherry must prove that they harbored an ulterior purpose in seeking the indictment against her and committed a willful, coercive act in furtherance of that purpose. *See Garcia v. Whitaker*, 400 S.W.3d 270, 276 (Ky. 2013) (citations omitted). In responding to Defendant's renewed motion for summary judgment, Cherry has pointed to facts suggesting that Defendants intentionally misled the prosecutor and the grand jury in order to improve the pawn shop ordinance's chances of success. Because Cherry presents a genuine issue of material fact as to both elements of her abuse of process claim, Defendants' motion must be denied, and her case may proceed to trial.

Broadly speaking, abuse of process is "the irregular or wrongful employment of a judicial proceeding." *Stoll Oil Refining v. Pierce*, 337 S.W.2d 263, 266 (Ky. 1960). The essential elements of an abuse of process claim under Kentucky law are "(1) an ulterior purpose and (2) a willful act in the use of process not proper in the regular conduct of the proceeding." *Garcia*, 400 S.W.3d at 276. To succeed, the plaintiff must show that the defendant engaged in "[s]ome definite act or threat not authorized by the process, or aimed at an objective not legitimate in the use of the process." *Simpson v. Laytart*, 962 S.W.2d 392, 394 (Ky. 1998) (citing W. Prosser, *Handbook of the Law of Torts* § 121 (4th ed. 1971)). Conversely, "there is

6

no liability where the defendant has done nothing more than carry out the process to its authorized conclusion even though with bad intentions." *Id.* at 394-95.

An ulterior purpose has been characterized as "[t]he crux of an abuse of process action." *Bourbon Cnty. Joint Planning Comm'n v. Simpson*, 799 S.W.2d 42, 45 (Ky. Ct. App. 1990). Kentucky courts have gone so far as to say that "[t]he purpose for which the process is used, once it is issued, is the only thing of importance." *Williams v. Central Concrete Inc.*, 499 S.W.2d 460, 461 (Ky. Ct. App. 1979) (citing Prosser, *Torts* § 121). For instance, in *Garcia*, an attorney disputed the hefty bill his mechanic charged him for repairs to his Porsche. *Garcia*, 400 S.W.3d at 272-73. After the attorney, Whitaker, refused to pay, the mechanic, Garcia, refused to hand over the Porsche. *Id.* at 273. Whitaker then obtained a warrant for Garcia's arrest for failure to make required disposition of property, and accompanied the deputy sheriff to Garcia's home when he served the warrant. *Id.* Upon questioning by the deputy, Garcia admitted that he had hidden Whitaker's car in a neighbor's garage. *Id.* The criminal charges were eventually dismissed, and Garcia filed suit against Whitaker for abuse of process. *Id.* Overturning a directed verdict in Whitaker's favor, the Kentucky Supreme Court found that "a jury could have determined that Whitaker harbored an ulterior purpose—that purpose being to use the criminal complaint and resulting arrest to obtain his vehicle without compensating Garcia." *Id.* at 277.

In another case, *Sprint Communications Co., L.P. v. Leggett*, 307 S.W.3d 109, 111 (Ky. 2010), a telecommunications provider sought to acquire a certain parcel of

7

land belonging to Leggett, the plaintiff, in order to expand and upgrade one of its facilities. When Leggett refused to sell, Sprint initiated condemnation proceedings, as it has previously threatened to do, and Leggett counterclaimed for abuse of process. *Id.* at 111-12. The Kentucky Supreme Court held that the trial court erred in granting Sprint summary judgment, noting that "even a cursory reading of the [applicable] statute reveals that Sprint had no authority to take for its permanent use the entirety of Leggett's land." *Id.* at 115. Sprint's attempt to use legal process to acquire fee simple title to Leggett's land was "a purpose for which a condemnation action . . . is not authorized," thus allowing Leggett's claim to go to a jury. *Id.* at 116.

As to the second element, Kentucky courts look for "'a willful act . . . not proper in the regular conduct of the proceeding,' used as a 'form of coercion to obtain a collateral advantage.'" *Id.* at 117 (quoting *Simpson*, 962 S.W.2d at 395). The act may occur either before or after process is issued. *Id.* at 118. In *Garcia*, the defendant engaged in a willful, coercive act when he "accompan[ied] the arresting deputy sheriff and detective to Garcia's home in perfecting the arrest and obtaining his Porsche." *Garcia*, 400 S.W.3d at 277. Likewise, in *Leggett*, Sprint threatened legal action in an attempt to achieve a result not authorized by law. *Leggett*, 307 S.W.3d at 119. Conversely, in *Mullins v. Richards*, 705 S.W.2d 951, 952 (Ky. Ct. App. 1986), discussed in greater detail below, the Court of Appeals found no liability for abuse of process when the defendants never attempted to use their ill-founded indictments against the plaintiff.

Here, a genuine issue of material fact exists with respect both elements of Cherry's abuse of process claim. As the Court noted in its prior opinion, the record contains affidavits from two former members of the Hopkinsville Police Department, Terry Parker and Chuck Inman. *See* [DN 37-2; DN 37-3.] Both Parker and Inman recall Chief Howie making derogatory statements when speaking about Cherry. [DN 37-2 at 1; DN 37-3 at 1.] Inman also states that Howie asked him to look into Cherry's campaign finances. [DN 37-3 at 1.] The Court is also mindful that the police department's investigation began very soon after Cherry voiced her opposition to Howie's proposed pawn shop ordinance. Temporal proximity alone might not be enough to raise an inference that Defendants initiated Cherry's criminal prosecution to secure an advantage before the city council. However, the suggestive timeline combined with the evidence of Howie's animus toward Cherry constitutes sufficient evidence for a jury to conclude that Defendants harbored an ulterior purpose.

Cherry also presents a genuine issue of material fact regarding whether Defendants took some "willful act" as a "form of coercion to obtain a collateral advantage." *Leggett*, 307 S.W. at 117. In the typical abuse of process claim, the plaintiff satisfies the willful act element by showing that the defendant directly bargained with her, using the wrongful process as leverage. *See, e.g., Garcia*, 400 S.W.3d at 277; *Leggett*, 307 S.W.3d at 119; *Flynn*, 399 S.W.2d at 494 (defendants used arrest warrant to convince plaintiff to release wage garnishment); *Isham v. ABF Freight Sys., Inc.*, Nos. 2004-CA-001349-MR, 2005-CA-000409-MR, 2006 WL

9

2641398, at *10 (Ky. Ct. App. Sept. 15, 2006) (employer used criminal charge as leverage to obtain employee's resignation). Cherry's claim is slightly different, because her claim is predicated upon the notion that Defendants used Pryor as a pawn or conduit to coerce Cherry into resigning.

Still, Cherry points out that Howie, Alexander, and Pryor are somewhat inconsistent in their explanations of the nature and extent of their pre-indictment investigation into Cherry's conduct. *See* [DN 71 at 2-6.] Although Alexander testified before the grand jury that Cherry convinced Clodfelter to make a written statement that the masturbating burglar she saw outside her window was black, not white, the Court has not been made aware that any such statement exists. *See* [DN 71-1 at 22.] In fact, Clodfelter testified that no member of the Hopkinsville Police Department or the Commonwealth Attorney's office ever spoke with her regarding Cherry's alleged attempt to coerce Clodfelter into changing her story. [DN 34-2 at 24-25.] Most importantly, Pryor recalls having at least one conversation with Alexander regarding the impact of the criminal proceedings on Cherry's eligibility for office. [DN 69-2 at 4.] Mindful of the oft-repeated quote that "[t]he purpose for which the process is used, once it is issued, is the only thing of importance," *Williams* 499 S.W.2d at 461 (citing Prosser, *Torts* § 121), the Court believes that a reasonable jury could conclude that Howie and Alexander's pre-indictment conduct could constitute "willful act[s] . . . not proper in the regular conduct of the proceeding," *Garcia*, 400 S.W.3d at 276.

10

One final point bears mention. Defendants correctly state that no liability for abuse of process will lie "where the defendant has done nothing more than carry out the process to its authorized conclusion even though with bad intentions." *Simpson*, 962 S.W.2d at 394-95. Relying upon this language, Defendants argue that a settlement like Cherry's, wherein a politician agrees to resign and not to seek further elected office, is the natural and probable consequence of criminal proceedings for official misconduct. To support this contention, Defendants cite *Arnold v. McClain*, 926 F.2d 363 (5th Cir. 1991). There, the Fifth Circuit suggested that it was acceptable for a prosecutor to promise not to bring perjury charges against a police officer in exchange for the officer's resignation. *Id.* at 966-67. But *Arnold* is procedurally and factual distinguishable from the case at bar. A state court had already ruled that the agreement between the officer and the prosecutor was enforceable, such that the prosecutor could not renege and bring a perjury charge anyway. *Id.* at 964, 966.

More importantly, though, *Arnold* did not involve the resignation of an elected official, nor did it address the implications of an agreement restricting a person's ability to hold public office in the future. Granted, "an individual does not have a fundamental right to run for elected office." *Molina-Crespo v. U.S. Merit Sys. Protection Bd.*, 547 F.3d 651, 660 (6th Cir. 2008). Furthermore, pursuant to the Kentucky Constitution, "[a]ll persons shall be excluded from office who have been . . . convicted of a felony, or of such high misdemeanor as may be prescribed by law." Ky. Const. § 150. But at their core, plea bargains are contracts, and are

11

interpreted and enforced according to traditional principles of contract law. *United States v. Robison*, 924 F.2d 612, 613 (6th Cir. 1991) (citations omitted). One such principle "is that agreements that run contrary to law, or are designed to avoid the effect of a statute, are illegal and will not be enforced." *McClanahan v. Commonwealth*, 308 S.W.3d 694, 701 (Ky. 2010) (citations omitted). Here, no party disputes that when Cherry promised to resign and not pursue further elected office in Hopkinsville, she still met the statutory qualifications for those positions. *See* KRS 83A.040. Her agreement with the Commonwealth therefore had the practical effect of superseding a law passed by the General Assembly. A jury could reasonably find that by extracting this seemingly unenforceable promise from Cherry, Defendants went further "than carry[ing] out the process to its authorized conclusion." *Simpson*, 962 S.W.2d at 394-95.

## VI. Conclusion and Order

A genuine issue of material fact exists with respect to each element of Cherry's abuse of process claim. Accordingly, a jury, not this Court, should determine whether Defendants used legal process as a "threat or club" to force Cherry off city council. *Flynn v. Songer*, 399 S.W.2d 491, 494 (Ky. 1966). For the foregoing reasons, IT IS HEREBY ORDERED:

Defendant's motion for summary judgment [DN 69] is DENIED. In accordance with the Court's prior scheduling order, [DN 59], a **telephonic final pretrial conference shall be held April 7, 2017 at 9:00 a.m. Central time.** The Court will place the call to counsel.

CC: Counsel of Record